IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., Individually and On Behalf of All Others Similarly Situated, | § § § § § § | |
| Plaintiffs, | § | |
| VS. | § § | CIVIL ACTION NO. H-04-0088 CONSOLIDATED CASE |
| MILBANK, TWEED, HADLEY & McCLOY LLP, ANDREWS & KURTH LLP, AND THE GOLDMAN SACHS GROUP, INC., | § § § § | |
| Defendants. | § | |

**OPINION AND ORDER OF PARTIAL DISMISSAL**

Pending before the Court in H-04-0088, a putative class action brought on behalf of purchasers of Enron Corporation's ("Enron's") publicly traded equity and debt securities between October 19, 1998 and November 27, 2001, alleging that Defendants' violations of the federal securities laws caused Plaintiffs injury, is *inter alia* a motion to dismiss filed by Defendant Andrews & Kurth LLP (#19).

The Court refers the parties to, and hereby incorporates, its Memorandum and Order *Re* Secondary Actors'

Motions to dismiss (#1194, issued on 12/19/02) in *Newby*[1] because
it addresses the relevant law in detail and the parties base some
of their arguments on that opinion.

The governing pleading of Plaintiffs The Regents of the
University of California, which serves as Lead Plaintiff in *Newby*,
and Nathaniel Pulsifer, Trustee of Shooters Hill Revocable Trust,
is the Amended Complaint (#9).

Andrews & Kurth LLP ("A&K") moves to dismiss under
Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private
Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§
77 and 78, for failure to state a claim under Section 10(b) of the
Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-
5, 17 C.F.R. § 240.10b-5.

The Amended Complaint asserts that A&K, motivated by
extraordinarily high fees (over $30 million), structured and
prepared documents relating to FAS 140 Transactions for Enron; it
also allegedly improperly issued to Enron and to Enron's auditors
at Arthur Andersen LLP opinions regarding these structured
transactions that A&K knew were to be relied upon as evidential
support for the continuing false accounting treatment of the
transactions, and thereby manipulated and falsified Enron's
reported net income, cash flows and debt.[2]   Amended Complaint at

---

[1] *In re Enron Corp. Sec. Litig.*, 235 F. Supp. 2d 549 (S.D.
Tex. 2002).

[2] The Amended Complaint at ¶ 60 represents that these FAS 140
transactions "falsely inflated Enron's reported net income and
shareholder equity approximately $350 million and cash flow $1.2
billion, and falsely decreased Enron's reported debt approximately
$1.1 billion." See also Appendix B at 85 to the Bankruptcy Examiner

¶ 14.   Plaintiffs contend that the A&K opinion letters concluded that, under bankruptcy and other laws, the FAS 140 Transactions[3] were "sales" when they were actually more similar to loans.  For an FAS 140 transaction to be legitimate, it had to be a "true sale," with the asset "legally isolated" from Enron and its creditors; the thirty transfers of assets at issue were not, according to the Amended Complaint.[4]

A&K objects that Plaintiffs did not allege, and that it did not make, any representations about accounting matters (for SEC filings, public financial disclosures, or shareholder communications) and that each opinion letter it issued contained language specifically disclaiming responsibility for the

––––––––––––––––

Neal Batson's Report, Ex. 1 to #26.

[3]   FAS 140 transactions, according to Plaintiffs, are fraudulent structured finance transactions that appear to comply with Financial Accounting Standard 140 and/or its predecessor FAS 125, but in fact did not comply with either the spirit or the letter of Generally Accepted Accounting Principles ("GAAP"). According to the Amended Complaint, A&K knew that the transactions violated GAAP because FAS 140 required that assets actually be sold or legally isolated, that Enron not retain the risks and benefits of ownership, and that Enron not continue to control the transferred assets by retaining the right to buy them back whenever it so chose; these transfers did not comply with these requirements.

[4]   The determination whether the financial assets have been isolated, i.e., "put presumptively beyond the reach of the transferor and its creditors," depends on all the facts and circumstances, including "whether the contract or circumstances permit the transferor to revoke the transfer," whether the transfer "would likely be deemed a true sale at law," and whether the transferor is affiliated with the transferee."  Examiner's Final Report, #22, Ex. A at 27, quoting ¶ 23 of FAS 125, the predecessor to FAS 140.

preparation of financial statements for Enron and its affiliates.[5] A&K maintains that "[t]he transactions themselves were not illegal."[6] A&K emphasizes that none of these opinion letters ever reached the public and thus no investor relied on any of them. Furthermore, all but one of the opinion letters was addressed to its client, Enron.

_____

[5] Plaintiffs respond that this argument misses the point: they

> sue A&K not for giving accounting advice but for knowingly providing misleading opinion letters to purposefully falsify Enron's financial statements and deceive investors. This is not accounting advice but legal advice. "A determination about whether the isolation criterion has been met to support a conclusion regarding surrender of control is **largely a matter of law**."

#22 at 14-15, quoting from Appendix C of the Bankruptcy Examiner Neal Batson's Final Report, parts of which are attached as Ex. A at 27-28 to #22, Plaintiffs' Opposition. (A copy of other parts of the report, specifically Appendix B focusing on Arthur Andersen, is attached as Ex. 1 to A&K's Reply, #26.)  Plaintiffs assert that any claim of accounting ignorance on A&K's part is undermined by the fact that two of three of A&K's primary attorneys on the Enron FAS 140 transactions (Tom Popplewell and Patrick Sargent) were CPAs. *Id*. at 15 n.8.

[6] Plaintiffs object that the transactions "were specifically designed to, and did, falsify Enron's financial results" and that Defendants' use of the FAS 140 transactions was illegal: "Intentionally deceiving investors by structuring transactions to *appear* to comply with FAS 140 guidances--when they do not--is illegal.  Indeed, it is fraud." #22 at 6.

A&K argues that under the law of the case doctrine,[7] the
claims against it should be dismissed for the same reasons that
the Court dismissed "functionally identical" claims against
Kirkland & Ellis LLP ("K&E") in #1194:  (1) A&K did not author or
participate in the creation of any allegedly misleading financial

---

[7] A&K cites *Kennedy v. Lubar*, 273 F.3d 1293, 1298 (10th Cir.
2001)("'Law of the case rules have developed to maintain
consistency and avoid reconsideration of matters once decided
during the course of a single continuing lawsuit.'")(*quoting* 18
Wright, Miller & Cooper, *Federal Practice & Procedure*:
Jurisdiction § 4478 at 788 (1981)).
        This Court finds that A&K have misrepresented the law of
the case doctrine, which technically is not applicable to rulings
by this Court that were not appealed and decided by the appellate
court.  The law of the case doctrine is that "'an issue of law or
fact decided on appeal may not be reexamined either by the district
court on remand or by the appellate court on a subsequent appeal.'"
*Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002)(*citing
United States v. Becerra*, 155 F.3d 740, 752 (5th Cir. 1998)), *cert.
denied*, 537 U.S. 883 (2002).  A&K's authority is in accord.
*Kennedy*, 273 F.3d at 1299 ("'Law of the case principles do not bar
a district court from acting unless an appellate decision has
issued on the merits of the claim sought to be
precluded.'")(*quoting Wilmer v. Board of Cty. Comm'rs*, 69 F.3d 406,
409 (10th Cir. 1995)).   The Fifth Circuit has recognized three
exceptions:   (1)  evidence presented in a subsequent trial is
substantially different; (2) the controlling authority has since
made a contrary decision of law on the issue; or (3) the first
decision by the appellate court was "'clearly erroneous and would
work a manifest injustice."  *Id.* at 365, *citing Becerra*, 155 F.3d
at 752-53.  The Fifth Circuit observes that the doctrine "is an
exercise of judicial discretion which 'merely expresses the
practice of courts generally to refuse to reopen what has been
decided,' not a limit on judicial power."  *United States v. Lee*,
358 F.3d 315, 320 (5th Cir. 2004), *quoting Messinger v. Anderson*,
225 U.S. 436, 444 (1912).   The Tenth Circuit also views the
doctrine as discretionary, not mandatory, because "'[a]lthough
courts are often eager to avoid reconsideration of questions once
decided in the same proceeding, it is clear that all federal courts
retain power to reconsider if they wish.'"  *Kennedy*, 273 F.3d at
1299, *quoting* 18 Wright, Miller & Cooper, *Federal Practice &
Procedure*:  Jurisdiction § 4478 at 789 (1981).
        Instead of the law of the case, however, the Court views
A&K's argument as one for consistency of ruling in light of what
A&K characterizes as very similar factual allegations against the
dismissed K&E.

statement; (2) none of A&K's purported representations in its legal opinions issued to its client was intended to, nor did one ever, reach the public; (3) because it made no public statement, A&K did not owe a duty, including a duty to disclose, to Plaintiffs, nor have Plaintiffs alleged any facts to support the existence of a duty[8]; (4) since Plaintiffs fail to allege that A&K prepared or participated in preparing any misrepresentation or material omission, or that A&K used or employed manipulative devices, in connection with the purchase or sale of Enron securities, Plaintiffs cannot allege that they relied on A&K in their purchase or sale of Enron securities[9]; and (5) Plaintiffs

---

[8] A&K notes that in #1194 in addressing claims against Vinson & Elkins this Court recognized a limited exception to the general rule that, in light of the lawyers' duties of client confidentiality and loyalty, "lawyers are accountable only to their clients for the sufficiency of their legal opinions": a duty to a third party may arise if the attorneys "take the affirmative step of speaking out, whether individually or as essentially an author or co-author in a statement or report . . . about their client's financial condition . . . ." *Enron*, 235 F. Supp. at 610. Thus any legal opinion provided by a lawyer to his client that does not reach or was not intended to reach the public cannot give rise to a duty to third parties. *Id.* at 706. A&K maintains that it never prepared, participated in preparing, nor made a public financial disclosure about Enron and the FAS 140 transactions.

Plaintiff contends that the "crux" of A&K's misleading opinion letters was conveyed to the public through the SEC filings, financial reports, and certifications of compliance with GAAP by Enron's auditor, Arthur Andersen, for whose use the opinion letters were expressly intended.

[9] Plaintiffs' Amended Complaint alleges at ¶ 57 that the only third party allowed to rely on its opinion letters was Arthur Andersen, which was permitted to use them "solely as evidential support in determining the appropriate accounting and financial treatment of the [t]ransactions." A&K contends that in dismissing K&E this Court has already rejected the claim that but for such opinion letters, in this instance provided by A&K, Enron could not have obtained the kind of accounting treatment it allegedly sought in order to perpetrate its fraud.

cannot allege with specificity facts that would give rise to a strong inference of scienter that A&K acted to defraud investors in the purchase or sale of Enron securities or that it knew how Enron and Arthur Andersen ultimately accounted for and reported the FAS 140 Transactions on which A&K worked. Furthermore, not only is there no alleged public misrepresentation by A&K, but Plaintiffs have not pleaded that A&K used the FAS transactions as manipulative devices or contrivances or that A&K invested in or profited from any dealings with Enron outside of routine legal services.

Because there are no alleged misrepresentations, omissions or devices or contrivances at issue, A&K insists there could be no reliance by the Plaintiffs personally or the market generally, a critical element for any claim under § 10(b) and Rule 10b-5.

Nor, contends A&K, have Plaintiffs pleaded scienter with adequate factual specificity so as to give rise to a strong inference that A&K acted with severe recklessness or intent to deceive. Plaintiffs have not provided facts demonstrating how A&K knew that the transactions were being used to manipulate Enron's financial statements or how A&K discovered how Enron and Arthur Andersen ultimately accounted for and reported the FAS 140 transactions. A&K insists that as a law firm without accounting expertise, it was not qualified to second guess one of the leading accounting firms in the world.

Lead Plaintiff disagrees and insists that the Court's prior opinion regarding the law firms of K&E and Vinson & Elkins

supports rather than undermines its claims against A&K.  It points
out that attorneys may be sued under 17 C.F.R. § 240.10b-5(a) and
(c) for participating in a fraudulent scheme or committing
fraudulent acts (structuring and documenting twenty-eight sham
transactions and providing legal opinions to be relied upon by
third parties to their injury), as well as under (b) for a
material misrepresentation or omission.  *In re Global Crossing
Ltd.*, 322 F. Supp.2d 319, 335 (S.D.N.Y. 2004)("It is apparent from
Rule 10b-5's language and the caselaw interpreting it that a cause
of action exists under subsections (a) and (c) for behavior that
constitutes participation in a fraudulent scheme, even absent a
fraudulent statement by the defendant.").  Moreover for claims
under subsections (a) and (c), reliance can be established by the
fraud-on-the-market doctrine.  *Enron*, 235 F. Supp.2d at 693.
Plaintiffs contend that A&K's actions contributed to the
falsification of Enron's financial results, on which the market
did rely, to meet Wall Street expectations.  Citing portions of
the Enron Bankruptcy Examiner Neal Batson's Final Report, Ex. A to
#22, Lead Plaintiff accuses A&K of knowingly and/or with
deliberate recklessness structuring and documenting the 28 bogus
FAS 140 transactions to falsify Enron's financial results and
providing misleading opinion letters that were key to concealing
the manipulation of Enron's financial statements.  The Amended
Complaint characterizes these transactions, in essence, as loans
collateralized by monetizing Enron's underperforming assets by
sham asset sales to strawman entities created and controlled by
Enron for that purpose, effected to falsify the public disclosure

of Enron's debt levels, cash flows, and income by hundreds of millions of dollars, although throughout the transfers Enron actually retained control over and the risk associated with the assets, in violation of GAAP.[10]

As for scienter, Lead Plaintiff argues that because A&K simultaneously created and unwound transactions more than a dozen times, at suspicious times immediately before or after the end of financial reporting periods, A&K knew that the transactions had no legitimate business purpose.  Amended Complaint at ¶ 73.  Other times the transaction was unwound even before A&K delivered the opinion letter to Enron evidencing its "sale" or "true issuance." *Id.* at ¶¶ 73, 75-78.  Moreover, within a very short period, Enron would "sell" an underperforming asset to an entity controlled by Enron and created to "buy" it, recognize the "gain" on its books,

---

[10] Plaintiffs describe the relevant part of the Enron *Ponzi* scheme as follows:

> In the bogus FAS 140 transactions Enron "monetized" nonperforming assets by "selling" them to a strawman it had created for the purpose of each transaction--but Enron retained all control and all risk associated with the asset as if no sale had ever occurred. . . . The strawman "paid" Enron for the asset with borrowed money, which Enron was obligated to repay on behalf of the strawman. . . . A&K drafted the crucial document for the FAS 140 transactions, including the "Total Return Swaps" and "true sale" or "true issuance" opinions necessary to disguise these loans as legitimate FAS 140 transactions.

#22 at 5.  A&K attorneys working on the FAS 140 Transactions testified that the Total Return Swaps, used to enable Enron to maintain control of the assets it claimed to sell, were unlike anything they had seen or used before even though they worked on hundreds of transactions, thus raising suspicion of fraud.

then unwind the sale by "buying" it back, create another entity
again under Enron's control and sell the same asset to it at a
higher price to reach financial targets and "cook the books."
Amended Complaint at ¶¶ 77-78 (Projects Ghost and Specter).
Because Enron controlled the entities that "bought" the assets,
their claimed value was irrelevant and unreliable.

In addition, Plaintiffs have pleaded, and the testimony
of A&K attorneys Patrick Sargent and Barbour supports their
contention, that A&K's transactions were critical to satisfy the
criteria of FAS 140 and to Enron's intended accounting treatment.[11]
A&K knew that its opinion letters were essential to provide Arthur
Andersen with evidence of "legal isolation" required by FAS 140 by
falsely representing that the FAS 130 transactions had been "sold"

---

[11] Plaintiffs argue that A&K attorneys' sworn statements also
demonstrate scienter. For example, they testified that the firm
knew that the money raised through each bogus transaction would not
be reflected as debt on the balance sheets even though it was
actually a loan and Enron retained the risks and rewards of owning
the transferred asset. They also acknowledge that Enron recognized
gain on its income statement in FAS 140 transactions when the
proceeds received from the "sale" exceeded the value of the
transferred asset. Examiner's Final Report, Ex. A at 54-55.
Specifically Batson's report states that A&K

> recognized that Enron retained the risks and
> rewards of assets being transferred and that
> Enron did not want to surrender control of the
> asset being transferred. Moreover, Andrews &
> Kurth assisted Enron with the repeated and
> consistent prepayment and unwinding of many of
> these FAS 140 Transactions, such that a fact-
> finder could determine that Andrews & Kurth
> came to know that these assets were not being
> isolated from Enron by these transactions.

*Id.* at 56. The Bankruptcy Examiner also concluded, "As the number
of prepayments and unwinds grew, Andrews & Kurth also knew that the
transactions were being used by certain officers of Enron to
manipulate its financial statements." *Id.* at 187.

- 10 -

or were sufficiently "isolated" from Enron and its creditors to be "true sales." Batson's Final Report at 55-56 ("Andrews & Kurth knew that the opinions it rendered in the FAS 140 Transactions were critical to Enron's intended accounting treatment."). Moreover, the letters expressly stated that Arthur Andersen could use them "as evidential support in determining the appropriate accounting and financial treatment of the [t]ransactions." Amended Complaint at ¶ 66, relying on the Bankruptcy Examiner's Final Report, Ex. A at 55-56 and nn.185-191 (summarizing, "A fact-finder could conclude that, but for the opinions provided by Andrews & Kurth, Enron could not have obtained the accounting treatment it desired on the FAS 140 Transactions, and that Andrews & Kurth knew this."[12]). Arthur Andersen did rely on the opinion letters in conducting its audits and in certifying to the public that Enron's financial statements complied with GAAP, and thereby indirectly conveyed the crux of A&K's legal conclusions to the public. Thus, argue Plaintiffs, the substantive gist of these letters was intended to reach the public.

---

[12] A&K construes this quotation by Plaintiff as an attempt to hold A&K "accountable for the alleged misrepresentations of others and the accounting treatment of Enron's auditors." #19 at 6. It points out that the Court dismissed allegations against K&E, and urges the same with the claims against A&K, because "Lead Plaintiff alleged that [K&E] represented some of the illicit Enron-controlled, non-public SPEs and partnerships that Enron, but not [K&E], used for transactions (devices or contrivances) to hide its debt and record sham profits, disguising its true financial condition, and performed legal services on their and Enron's behalf. The complaint does not allege that [K&E] invested in any partnership or profited from any dealings with Enron other than performing routine legal services for the partnerships." *Enron*, 235 F. Supp.2d at 705-06.

Plaintiffs emphasize, as this Court has previously concluded, that a fraudulent statement is not necessary for liability under § 10(b); participation in a scheme or course of business to defraud or use of a device or artifice to defraud is sufficient. #1194 at 29-39; *In re Global Crossing Ltd.*, 322 F. Supp.2d 319, 335 (S.D.N.Y. Mar. 23, 2004)("It is apparent from Rule 10b-5's language and the caselaw interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant."). Plaintiffs assert that A&K's "vitally important" deceptive acts (creating and dismantling the transactions, documenting them, and supplying critical opinion letters) in furtherance of Defendants' fraudulent scheme meet the requirements for liability under the statute. The FAS 140 transactions served no business purpose other than to artificially inflate earnings and cash flow or hide debt and were inherently fraudulent, created to manipulate Enron's financial statements, the Amended Complaint charges.

Moreover, unlike the allegations against K&E, which this Court found to be "conclusory," Plaintiffs insist they have pleaded in detail the particulars of A&K's critical role in the scheme to defraud investors.

Plaintiffs also distinguish the claims against K&E, which the Court dismissed, from the allegations here against A&K. The Court found the assertions against K&E, which worked on private transactions on behalf of a client that was not Enron, to be "conclusory and general." While K&E had not drafted any

documents that reached the plaintiffs or were created for the benefit of the plaintiffs, Plaintiff argues that A&K allegedly drafted opinion letters expressly to support Andersen's certification of Enron's publicly disclosed financial results and that certification of those documents was ostensibly for plaintiffs' benefit. Moreover, the Court upheld claims against Vinson and Elkins and Arthur Andersen under Texas's restrictive common law approach and under Restatement (Second) of Torts § 531 (1977), finding that the "limited group" intended to rely or that might reasonably be expected to rely on their material misrepresentations, and did rely to their loss, included the plaintiff investors; here it was completely foreseeable that plaintiffs would rely on the information in A&K's letters, which provided critical evidentiary support for the accounting treatment that falsified Enron's financial results, which in turn was a critical element of the Ponzi scheme. *Enron*, 235 F. Supp.2d at 611, 604, 693. Texas law and the Restatement do not require privity between the plaintiff and the attorney defendant or that the plaintiff receive the attorney's opinion directly from that lawyer. *Id.* at 604 ("a misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct"). The federal securities laws expressly impose liability on those who "directly or indirectly" mislead investors. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. This Court adopted the position of the SEC that public attribution is not necessary to impose liability on parties primarily responsible for false statements used to influence investors to buy securities.

In reply, A&K contends that Plaintiffs' new characterization of its claims of "scheme" liability under subsections (a) and (c) of Rule 10b-5 does not circumvent the rule that law firms have a duty to third parties not in privity with them to not issue materially misleading statements on which they intend or have reason to expect those third parties will rely **only** when they take the affirmative step of speaking out. *Enron*, 235 F. Supp.2d at 609-10. The Court dismissed allegations against K&E under all three subsections because K&E never spoke out publicly; instead any opinion letters it drafted were not drafted for the benefit of the plaintiffs nor did K&E serve as counsel for Enron's SEC filings. *Id.* at 705-06. In contrast, the Court found that Vinson & Elkins spoke out frequently in Enron's press releases and SEC filings. A&K also points out that Lead Plaintiff has inconsistently pled that K&E's true sale opinions were not drafted for the public benefit, but now asserts that A&K's were. A&K's opinion letters were drafted for Enron in private transactions, and they contained no information, financial or otherwise, that was received directly or indirectly by the public. Calling A&K's actions a scheme, artifice or device does not change the underlying reality. Furthermore, A&K argues that FAS 140 is an established feature of structured finance in the business and banking worlds and delivering opinions in connection with such transactions is a common, routinely performed legal service, which A&K performed at Enron's request. Plaintiffs have not alleged that A&K contrived or designed these transactions or invested or profited from any dealings with Enron. Given A&K's reliance on

the Bankruptcy Examiner's Report for the factual basis of its complaint, A&K points to Appendix B of that report, Ex. 1 to # 26, finding that not A&K, but "Anderson helped Enron design the template or model" (at 20) for the FAS 140 transactions, among others and that "[e]vidence indicates that Andersen had deep involvement not only in the initial creation of the FAS 140 Transaction technique, but also in subsequent refinements to and modifications of the technique (at 85)." It further contends that the Amended Complaint is deficient because it fails to identify any statement in or omission from the opinions that is false or misleading and to explain how or why it is misleading, as required by the PSLRA, 15 U.S.C. § 78u-4(b)(1). The complaint does not point to any representation by A&K that the transactions complied with FAS 140 or GAAP; A&K maintains that it never certified that the transactions complied with FAS 140. A&K further insists the opinions did not represent that any assets in these transactions had been "sold," but addressed "legal isolation" of the assets, a term of art, at various stages of the transfer and discussed the impact that a declaration of bankruptcy by various parties would have on ownership of the asset. Arthur Andersen, not A&K, made the determination whether the asset had been sold under the accounting requirements of FAS 140.

The Court has examined the Amended Complaint under the standards enunciated in #2294. First, in attempting to determine whether the pleadings adequately allege that A&K committed a primary violation of the 1934 Act, the Court observes that, despite Lead Plaintiff's reiteration of the word "critical," the

allegations regarding the relatively minor role of A&K in the alleged *Ponzi* scheme were far fewer than those relating to K&E and which this Court dismissed for failure to plead a claim. *Enron*, 235 F. Supp.2d at 669-73. Second, characterizing the acts of A&K in providing what are indisputably legal services as devices, contrivances or part of a scheme under 17 C.F.R. § 240.10b-5(a) and (c) does not remove them from the protections accorded legal services within the attorney client relationship. The language in the Amended Complaint describing A&K's actions, e.g., that it "structured" and "documented" the FAS 140 transactions and "provided opinion letters," is too general to reveal precisely what A&K did that was fraudulent; Plaintiffs' conclusory statements that the opinion letters stated that the assets were "legally isolated" are not supported by facts or examples. Without such specificity, the A&K's actions and writings are indistinguishable from typical legitimate legal services. More importantly, Plaintiffs have failed to point to any specific misrepresentations and omissions in the transactional documents or opinion letters, no less explain how they were deceptive, or how and where they were specifically used by Arthur Andersen to defraud stock investors. Moreover, as with K&E, there is no factual allegation demonstrating that A&K took the affirmative step of communicating their purportedly falsified information to the public and that investors relied on that misinformation in purchasing Enron securities. Lead Plaintiff's argument that A&K'S opinion letters, which Plaintiff has failed to show with the required specificity were deceptive, were expressly intended to

provide evidential support to Arthur Andersen for its accounting judgments, of which Lead Plaintiff has again failed to give specific examples, and which Arthur Andersen subsequently incorporated into its financial statements and SEC filings on behalf of Enron, also without examples, is too vague and attenuated to constitute such an affirmative communication. Lead Plaintiff has also not alleged facts demonstrating that A&K directed or controlled Arthur Andersen and/or Enron in their use of A&K's opinion letters, nor has Lead Plaintiff specified any information provided by A&K that was purportedly incorporated into public statements by Arthur Andersen and/or Enron.

For these reasons, the Court

ORDERS that A&K's motion to dismiss with prejudice the claims against it is GRANTED.

**SIGNED** at Houston, Texas, this 12th day of September, 2005.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE